## CIRCUIT COURT OF HENRICO COUNTY

Lifesource Institute of
Fertility and Endocrinology

v.

Joseph Gianfortoni

December 8, 1989

Case No. CH89-000828-00

By JUDGE JAMES E. KULP

This matter comes before the Court on plaintiff's Bill of Complaint seeking a permanent injunction to restrain defendant from competing with the plaintiff. After hearing evidence and argument on July 28, 1989, the Court granted the plaintiff a temporary injunction until September 30. By agreement of the parties, the injunction was enlarged until the hearing on the permanent injunction on December 1, 1989.

The essence of this case is whether a covenant not to compete contained in paragraph 12 of an Employment and Stock Purchase Agreement (Plaintiff's Exhibit 1) should be enforced.

This Court heard some eight hours of testimony on December 1st from which the Court finds the following facts.

Dr. Robert J. Fierro began his practice in Richmond in the early seventies in the areas of obstetrics and gynecology. After about two years, he limited his practice to gynecology and infertility. His beginning practice was small, but in 1977 his practice had grown and he was

receiving referrals from outside Richmond. In January, 1986, Dr. Fierro felt that his volume of patients was increasing to such a point that he concluded he needed assistance. Another factor in his consideration to expand was that he wanted to enter the area of in vitro fertilization.

Dr. Fierro met Dr. Gianfortoni at a meeting in January, 1987, and invited him to Richmond to look over his practice. After some correspondence, Dr. Gianfortoni, who was practicing at Michael Reese Hospital in Chicago, came to Richmond with his family in January or February, 1988. After some discussions, Dr. Fierro contacted an attorney to prepare a contract which was sent to Dr. Gianfortoni. Through some telephone conversations some changes in the contract were agreed upon, and a final draft of the contract was sent to Dr. Gianfortoni. During this time Dr. Gianfortoni had secured the services of Gerald Bauman, a management consultant with considerable expertise in the medical field, to advise him on the contract of employment. Mr. Bauman had several meetings with Dr. Gianfortoni about the proposed contract. As a result of these meetings with Dr. Gianfortoni and his own review of the proposed contract, Mr. Bauman made an extensive list of areas of concern (Plaintiff's Exhibit 7). On March 3, 1988, Mr. Bauman wrote a letter to Dr. Fierro's attorney itemizing points he wanted to address about the proposed affiliation of Dr. Gianfortoni and Dr. Fierro (Plaintiff's Exhibit 8). One of these points concerned the covenant not to compete which is the subject of this litigation.

On March 6, 1988, Dr. Gianfortoni and Mr. Bauman came to Richmond to meet with Dr. Fierro, his attorney, and the accountant for Lifesource to discuss the proposed employment contract. Considerable negotiations were held between the parties and numerous changes in the contract were made (see contract, Plaintiff's Exhibit 1).

When the parties came to the covenant not to compete, Dr. Gianfortoni felt strongly there was no need for such a provision for it was not his intention to remain in Richmond should he sever his relationship with Lifesource. Dr. Fierro felt as strongly that such a provision had to be in the contract to protect the practice of Lifesource. After much discussion, neither party would concede and neither would sign the contract. Dr. Fierro was advised

by his attorney not to waive the covenant. Mr. Bauman suggested that Dr. Gianfortoni and Dr. Fierro discuss the matter privately between themselves which they did for about forty-five minutes. When they returned, the doctors had compromised and the covenant not to compete was modified to apply to one hundred miles distance from Richmond, excluding the City of Norfolk and northern Virginia, rather than apply to the entire Commonwealth of Virginia. The contract was then signed by the parties that day.

Dr. Gianfortoni came to work for Lifesource on July 1, 1988. Dr. Fierro introduced Dr. Gianfortoni to the patients of Lifesource and introduced him to the various medical facilities in Richmond, as well as members of the medical profession. At first, things went well, but in the latter part of 1988, Dr. Gianfortoni became dissatisfied and advised Dr. Fierro in January, 1989, that he intended to leave in the next six months. By letter of July 17, 1989 (Plaintiff's Exhibit 2), Dr. Gianfortoni advised Dr. Fierro that as of August 1, 1989, he would no longer be associated with Lifesource. Dr. Gianfortoni has set up practice in Richmond, and as of the time of the hearing on December 1 had about 75 patients, 25 to 30 of whom had previously been patients of Lifesource.

The parties agree that the criteria by which the validity of the covenant not to compete is to be judged is set forth by the Supreme Court of Virginia in *Paramount Termite Control Co., Inc. v. Rector*, 238 Va. 171 (1989).

(1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest?

(2) From the standpoint of the employer, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?

(3) Is the restraint reasonable from the standpoint of a sound public policy?

The burden is upon the one seeking to enforce the covenant to prove that the restraint is reasonable.

The covenant is narrowly drawn and restricts Dr. Gianfortoni only from performing four specialized medical procedures: (1) Gamete intrafallopian tube transfer, (2)

in vitro fertilization, (3) ovum donation, and (4) embryo transfer. As the Court understands the evidence, these four medical procedures are being performed at MCV and Henrico Doctors Hospital. It was agreed by both Dr. Fierro and Dr. Gianfortoni that patients seeking a physician to assist with infertility would more likely seek out a physician who could perform not only routine infertility procedures but who could also perform these four more sophisticated procedures.

Dr. Gianfortoni recognizes that a physician who can perform these four procedures has a competitive advantage, and he has made it clear that he would market his ability to perform these procedures in the Richmond area.

By his association with Lifesource, Dr. Gianfortoni has had access to all of the patients of Lifesource, has accepted the benefits of being introduced to the physicians who make referrals in this area, knows the financial condition of the corporation and its future plans. All of this information would certainly qualify Dr. Gianfortoni to be a formidable competitor in the central Virginia area. The evidence verifies this very fact since almost half of Dr. Gianfortoni's patients were former patients of Lifesource. At the hearing Dr. Gianfortoni advised the Court that he did not challenge the geographical restriction as being unreasonable, and he offered no evidence nor argument concerning the time restriction of two years.

In these circumstances, the Court concludes that the covenant not to compete is no greater than necessary to protect Lifesource's legitimate business interest.

In determining whether the covenant is unreasonably harsh and oppressive, the Supreme Court in *Foti v. Cook*, 200 Va. 800 (1980), has suggested that it is relevant to consider the parties involved, their respective positions and the circumstances of the transaction. The parties to this covenant are two highly educated doctors, both of whom had independent advisors when entering into the covenant. The evidence establishes that the parties occupied equal bargaining positions, and the evidence further establishes that the covenant which was finally adopted was the result of intense negotiations between the parties. At the time of the discussions, Dr. Gianfortoni took the position that no covenant was necessary as he had no in-

tention of remaining in Richmond should his relationship with Lifesource terminate. No one forced Dr. Gianfortoni to enter into the covenant. He was free to reject the contract, remain in his practice in Chicago, and continue to look for other opportunities.

Important to the Court's decision is the fact that the covenant in no way prevents Dr. Gianfortoni from practicing medicine, including the conventional forms of gynecology and obstetrics. He can also practice infertility and endocrinology medicine, and he can do so in Richmond or elsewhere.

The Court finds that the covenant does not unreasonably curtail Dr. Gianfortoni's legitimate efforts to earn a livelihood. He is only restricted in performing the four procedures and only within 100 miles of Richmond, excluding Norfolk and northern Virginia. The Court has been advised that since the injunction of this Court has been in effect, Dr. Gianfortoni has performed five IVF procedures in northern Virginia.

Dr. Gianfortoni asserts that it is against public policy to enforce any restrictive covenants in the case of physicians. His argument is that it is unethical for physicians to enter into such covenants and further that the public is ill served when a physician is prohibited from practicing.

The Court finds Dr. Gianfortoni's public policy argument has been answered by the decision of the Virginia Supreme Court in the case of *Charlottesville Family Medicine, P.C. v. Lynne P. Deane, M.D.*, rendered on October 10, 1989. In that case Dr. Deane entered into an employment contract with Charlottesville Family Medicine on August 8, 1986. Charlottesville Family Medicine was engaged in professional medical services and specializing in family practice in Charlottesville and Albemarle County. In return for her salary, Dr. Deane agreed that for a period of two years following the termination of employment, she would not directly or indirectly engage in rendering professional services or in any activity competitive with or adverse to the corporation's business or affairs within Albemarle County or the City of Charlottesville. On March 20, 1987, Dr. Deane resigned and began practice with a private for-profit hospital in Charlottesville.

While finding the covenant reasonably limited as to time and territory, the Supreme Court further found its enforcement would not be unreasonable from the standpoint of public policy.

The Court finds the limitations imposed upon Dr. Deane more restrictive than those imposed upon Dr. Gianfortoni in this case. If the more restrictive covenant in *Charlottesville Family Medicine* was not against public policy, *a fortiori* the less restrictive covenant in this case cannot be against public policy.

Dr. Gianfortoni has referred the Court to the Current Opinions of the Council on Ethical and Judicial Affairs of the American Medical Association 1986 (Defendant's Exhibit I), which states that restrictive covenants between physicians are discouraged. Whatever the merits of such a statement; it does not provide the legal standard by which this court is bound. From the evidence in this case, it would appear that this statement is honored in the breach more often than in practice. Mr. Bauman testified that restrictive covenants like the one in this case are standard in the medical profession. Dr. Gianfortoni also testified that he had entered into some discussions with a group of physicians in northern Virginia about locating there, but discussions broke off when they insisted on a covenant not to compete.

Also important to the Court's decision is the fact that Dr. Gianfortoni has voluntarily decided to sever his relationship with Lifesource. He has accepted the benefits of the agreement but now does not want to be bound by the terms with which he disagrees. "A court must give effect to the intention of the parties as expressed in the language of their contract, and the rights of the parties must be determined accordingly." *Foti v. Cook,* 220 Va. at 805. In this Court's opinion, it would be against public policy to allow a person to accept the benefits of an agreement but to disregard the terms of the agreement when it suits his purpose.

The Court finds the covenant not to compete is not unreasonable as to time and geographical area. It is no broader than necessary to protect the legitimate interests of Lifesource, and there has been no showing that the covenant has affected or will affect Dr. Gianfortoni's ability to earn a livelihood. The provisions are not harmful

to the general public. The Court is of the opinion that the covenant not to compete is reasonable and meets the criteria our Supreme Court has set forth in *Paramount Termite Control v. Rector.*

Dr. Gianfortoni makes two other assaults on the covenant. First, he argues that he was induced to enter into the agreement by fraud. He maintains that Dr. Fierro misled him about a proposed infertility clinic at St. Luke's Hospital, his privileges to perform the four IVF procedures, and the makeup of his patients. Dr. Gianfortoni maintains he would not have entered into the employment agreement had he not been misled about these matters by Dr. Fierro. Dr. Fierro has denied each of these allegations, and the Court finds that the independent evidence in the case refutes Dr. Gianfortoni's accusations of fraud. Mr. Bauman, who was Dr. Gianfortoni's advisor during the negotiations of the agreement, testified that in all of his discussions with Dr. Gianfortoni, he never mentioned the patient mix of Lifesource patients, and while Dr. Gianfortoni spoke in a positive manner about the possibility of an IVF unit at St. Luke's, such was never a condition to entering the agreement. Nor did Dr. Gianfortoni ever mention to Mr. Bauman that Dr. Fierro's privileges were an important factor. One who alleges fraud must establish it by clear and convincing evidence. *Nationwide Ins. Co. v. Patterson*, 229 Va. 627 (1985). The Court finds that Dr. Gianfortoni has failed to carry his burden.

Dr. Gianfortoni also urges the court not to enforce the covenant on the theory that since Dr. Fierro does not have privileges to perform the four IVF procedures, he would not be in competition with Lifesource. The evidence before the Court is that Dr. Fierro can perform the GIFT procedure at MCV under supervision and has an application for privileges to perform all four IVF procedures at Henrico Doctors Hospital. The evidence further established that Lifesource is actively engaged in securing a physician with similar skills as Dr. Gianfortoni to replace him.

The Court finds it anomalous that Dr. Gianfortoni, who has precipitated this situation, should seek relief from the terms of the agreement due to his own action. The covenant not to compete was for the protection of Lifesource, and to allow Dr. Gianfortoni to disregard its

terms while Lifesource replaces him would not be in keeping with either the terms or spirit of the covenant.

The Court finding that the contract is valid and the covenant not to compete reasonable grants the plaintiff's prayer for a permanent injunction to enforce the covenant not to compete as contained in paragraph 12(a) of the Employment Agreement.

Lifesource also seeks damages for what it alleges arises from Dr. Gianfortoni's breach of his duty of loyalty to the corporation. To support its allegation, Lifesource claims that while Dr. Gianfortoni was employed, he solicited Lifesource's patients for a new medical practice and engaged in other activities to organize a competing medical practice. During the hearing on December 1, Lifesource withdrew its allegation concerning the solicitation of its employees by Dr. Gianfortoni. Lifesource presented evidence that in January, 1989, Dr. Gianfortoni was contacting several local hospitals to explore his options. Dr. Gianfortoni also contacted groups outside of Richmond and in other states.

Lifesource relies upon *American Telephone & Telegraph Co. v. Winn*, a federal district court [order] decided January 15, 1989. The Court finds American Telephone distinguishable from the facts in this case. There employees formed and operated a competing company while still employed by AT&T. They promoted their company by making sales calls on AT&T customers and competitors while still employed by AT&T. The actions of the AT&T employees are a far cry from any action taken by Dr. Gianfortoni in this case. He did not engage in a competing practice while employed by Lifesource, nor did he solicit any of Lifesource's patients. His actions were no more than what one would expect when an employee is contemplating a move. The Court finds that plaintiff has failed to establish any disloyalty on the part of Dr. Gianfortoni.

Dr. Gianfortoni has filed a cross-bill seeking payment for his salary and other benefits provided for in the agreement. Lifesource has agreed that Dr. Gianfortoni is entitled to the balance of his salary, which the parties had agreed would be temporarily reduced, and the other items set forth on Defendant's Exhibit G should Lifesource not prevail on its disloyalty claim.

The Court having concluded that the evidence is insufficient to establish disloyalty on the part of Dr. Gianfortoni, the Court enters judgment for Dr. Gianfortoni on the cross-bill in the amount of $40,127.73.

There remains one further item in dispute, *i.e.*, $12,500 advanced by Dr. Fierro to Dr. Gianfortoni. Dr. Fierro asserts this was a loan to be repaid, and Dr. Gianfortoni claims it was for relocation expenses. Mr. Bauman testified that it was carried on the books of Lifesource as a loan, but that this was for bookkeeping purposes only, and that it was to be negotiated by the parties at a later date.

The Court finds that the $12,500 may have been part loan and part relocation expense, but the evidence is insufficient for the Court to determine how much was supposed to be for which purpose. Some of the money was used by Dr. Gianfortoni for closing costs on his home. Whether this was to be part of any agreement for relocation expenses is not shown by the evidence. This issue should be a matter to be resolved by the parties as Mr. Bauman indicated. If the parties cannot resolve the issue, the Court will hear further evidence on this issue and resolve it for the parties.